**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHASITY RODGERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-CV-00024-NCC |
| | ) | |
| ST. LOUIS COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 45). Defendant filed a Memorandum of Law in Support (Doc. 46) and Statement of Uncontroverted Material Facts (Doc. 47). Plaintiff filed a Memorandum of Law in Opposition to Defendant's motion (Doc. 52) and a Response to Defendant's Statement of Uncontroverted Material Facts and Additional Statement of Material Facts (Doc. 53). Defendant filed a Reply Memorandum of Law (Doc. 57) and Responses and Objections to Plaintiff's Statement of Additional Facts (Doc. 58). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c) (Doc. 5).

Upon careful consideration of the undisputed facts of record, the applicable law, and the written submissions of the parties, for the following reasons, Defendant's motion will be **GRANTED**.

## I. Background

Plaintiff Chasity Rodgers ("Plaintiff") was enrolled as a student at Defendant Saint Louis Community College ("STLCC" or "Defendant") in the Funeral Service Education ("FSE") program during the Fall 2023 and Spring 2024 semesters. STLCC is a public community

college. Dr. David Coughran ("Coughran") and Dr. Joseph Pugel ("Pugel"), who have been dismissed from this action, are professors for the FSE program who taught Plaintiff's FSE courses. Prior to the Fall 2023 semester, Plaintiff requested and was granted educational accommodations related to the following disabilities: ADD/ADHD, anxiety, and panic attacks. Plaintiff claims that due to discrimination based on her disability, she could not complete the FSE program.

Plaintiff initially brought this action in state court alleging disability discrimination pursuant to the Missouri Human Rights Act ("MHRA") against STLCC, Coughran, and Pugel (Count I); retaliation pursuant to the MHRA against all defendants (Count II); and disability discrimination under Title II of the Americans with Disabilities Act ("ADA") against all defendants (Count III). Defendants removed the case to federal court (Doc. 1).

Subsequently, Defendants filed a Motion to Strike (Doc. 8) and Defendants Coughran and Pugel filed a Motion to Dismiss all claims (Doc. 9). Plaintiff was granted leave to file an Amended Complaint, and it was filed on February 18, 2025 (Docs. 21, 23). Defendants filed a renewed Motion to Dismiss the claims against Coughran and Pugel on the following bases: they should be dismissed from Count III because individuals may not be sued in their individual capacities under Title II of the ADA; they should be dismissed from Count II because MHRA retaliation claims cannot be brought against individuals; and they should be dismissed from Count I because Plaintiff failed to exhaust her administrative remedies insofar as she filed her administrative charge against STLCC alone, and in turn received a letter permitting suit against STLCC alone (Doc. 24). Defendants also filed a Second Motion to Strike, requesting that the Court strike the clauses seeking punitive damages as part of Count III, because the ADA does not permit recovery of punitive damages (Doc. 27). Plaintiff conceded that the claims for

punitive damages should be withdrawn and that the claims against Coughran and Pugal in Count II should be dismissed (Doc. 28). The Court granted Defendant's Motion to Strike, and the clauses seeking punitive damages as part of Count III were stricken (Doc. 33). The Court also granted Coughran and Pugel's Motion to Dismiss and dismissed them from this action (*id.*). STLCC subsequently filed its Motion for Summary Judgment on all counts of Plaintiff's Amended Complaint (Doc. 45), and the motion is fully briefed and ready for disposition.

## II. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once the moving party demonstrates that there is no genuine issue of material fact, the nonmovant must do more than show there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing a genuine factual dispute that must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324. "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson*, 477 U.S. at 248). In ruling on a motion for summary judgment, all reasonable inferences must be drawn in a light most favorable to the nonmoving party. *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). "Though we are required to make all reasonable inferences in the non-movant's favor while reviewing the facts,

we are not required to 'accept unreasonable inferences or sheer speculation as fact.'" *Klum v. City of Davenport*, No. 24-2165, 2025 WL 2167879, at *2 (8th Cir. July 31, 2025) (quoting *Gilani v. Matthews*, 843 F.3d 342, 347, 349 (8th Cir. 2016)). The evidence is not weighed, and no credibility determinations are made. *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

## III. Preliminary Matters

In its Reply, Defendant asserts Plaintiff's Responses to Defendant's Statement of Uncontroverted Material Facts and Additional Statement of Material Facts violate Federal and Local Rules and should be disregarded, and that Plaintiff's self-serving affidavit should be stricken from the record (Doc. 57 at 2). Defendant has not filed motions with respect to these requests in accordance with E.D.Mo. L.R. 4.01, and accordingly, Plaintiff did not respond to these assertions. The Court will address these matters before turning to the substantive issues.

### A. Plaintiff's Responses to Defendant's Statement of Facts and Additional Statement of Material Facts

Plaintiff's Response to Defendant's Statement of Uncontroverted Facts includes "Plaintiff's Additional Statement of Material Facts," listing nearly seventy additional statements of fact (Doc. 53). Defendant urges the Court to disregard this filing for two reasons. First, Defendant argues that Plaintiff's denials of Defendant's Statement of Uncontroverted Material Facts are improper in that the evidence cited in each does not actually contradict the statement set forth and that Plaintiff's responses that argue a statement is taken out of context or unreliable, without citing to specific portions of the record that actually controvert that statement, is improper under federal and local rules (Doc. 57 at 3). Second, as to the seventy additional facts, Defendant argues Plaintiff is attempting to inundate and confuse the record and give the impression there must be controverted material facts for a jury to decide (*id.*). Defendant asserts almost every single statement is duplicative, a restatement of one of Defendant's facts,

immaterial, irrelevant, a legal conclusion, argumentative, or not supported by the record cited (*id*.). Defendant requests the Court disregard Plaintiff's entire Response (Doc. 53) as improper under Federal and Local Rules (Doc. 57 at 3).

Under E.D.Mo. L.R. 4.01(E), a "Statement of Uncontroverted Material Facts must set forth each relevant fact in a separately numbered paragraph stating how each fact is established by the record, with appropriate supporting citation(s)." Further, the rule states that a Response to Statement of Material Facts "must set forth each relevant fact as to which the party contends a genuine issue exists. The facts in dispute shall be set forth with specific citations(s) to the record, where available, upon which the opposing party relies." E.D.Mo. L.R. 4.01(E). The local rule also states that "[a]ll matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for the purposes of summary judgment unless specifically controverted by the opposing party." *Id.* The pertinent portion of Fed. R. Civ. P. 56(c)(1) provides:

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Additionally, the rule provides, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required, . . ., the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting

materials — including the facts considered undisputed — show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e). The Eighth Circuit has noted that where a non-movant's "voluminous filings were replete with conclusory allegations and legal argument, obfuscating any concise and specific statements of material fact that were contained within their pages" the pertinent local[1] rule, similar to the local rule here "exists to prevent a district court from engaging in the proverbial search for a needle in the haystack." *Nw. Bank & Tr. Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003).

The Court will not expend judicial resources ruling on each contention individually, nor will it entirely disregard Plaintiff's Response to Defendant's Statement of Uncontroverted Material Facts. Instead, the Court will consider any of Defendant's improperly addressed assertions of fact undisputed, and therefore, admitted, for the purposes of this motion. Fed. R. Civ. P. 56(e)(2). With respect to Plaintiff's seventy additional facts, the Court will only consider those facts properly supported according to the rules or admitted, or not properly controverted by Defendant. *See Nw. Bank & Tr. Co.*, 354 F.3d at 725 (affirming the district court's decision to deem as admitted all of the facts included in the movant's statement of material facts and limiting its consideration of the non-movants statement of additional facts as a sanction for non-movant's noncompliance with the local rule).

---

[1] The Eighth Circuit was reviewing the district court's application of Local Rule 56.1 of the Local Rules of the United States District Courts for the Northern and Southern Districts of Iowa, which required:

> the moving party must file a concise statement of material facts supported by specific citations to an appendix. L.R. 56.1(a). The party opposing summary judgment must file a response to the movant's statement that either "expressly admits, denies, or qualifies" each of the movant's material facts. L.R. 56.1(b)(2). A response to a statement of material fact that is not expressly admitted must be supported by specific citations to an appendix. L.R. 56.1(b). In addition, the party opposing summary judgment must file its own concise statement of material facts with supporting appendix citations. L.R. 56.1(b).

*Nw. Bank & Tr. Co.*, 354 F.3d at 724.

The Court will proceed pursuant to Fed. R. Civ. P. 56(e)(3), and consider the motion, supporting materials, and undisputed facts as defined by the rules and rulings above, and grant summary judgment if it determines these materials show Defendant is entitled to it. The Court will include detailed discussion of its consideration of pertinent facts as necessary below.

**B. Plaintiff's Affidavit**

Defendant also asserts that Plaintiff's self-serving affidavit should be stricken from the record (Doc. 57 at 3-4). Defendant argues the affidavit sets forth self-serving arguments and facts that are largely restatements of Plaintiff's Statement of Facts, with the addition of one new allegation that was not alleged in Plaintiff's First Amended Complaint or disclosed during discovery or in Plaintiff's Rule 26 disclosures (*id*. at 4).

In her affidavit, Plaintiff, for the first time, attests to facts regarding another FSE student, Gerald Summers ("Summers") (Doc. 53-7 at 1). Specifically, Plaintiff states,

> 2. In the Spring semester of 2024, other students similarly situated to me at Defendant St. Louis Community College ("STLCC") in the Funeral Service Education program (FSE), but without disabilities, were not subjected to the "12-hour rule" created by FSE instructor David Coughran as stated in his email to me on or about February 27, 2024. (See Plaintiff's Exhibit 15G attached hereto).
>
> a. For example, student Gerald Summers was not subjected to the 12-hour test rule to the best of my knowledge and belief.

*Id*. Defendant further argues this allegation is immaterial and irrelevant to the pending motion, in that Plaintiff was never subjected to the 12-hour test rule (Doc. 57 at 4).

First, although Defendant argues Plaintiff's affidavit sets forth self-serving arguments, that alone is not sufficient reason for the Court to strike it. It is true that the Eighth Circuit previously stated generally "that 'a properly supported motion for summary judgment is not defeated by self-serving affidavits.'" *Hamby v. Iowa*, 185 F.4th 816, 825 (8th Cir. 2026)

(quoting *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006)). Recently, however, the Eighth Circuit has clarified that:

> neither the absence of supporting documentation "nor the self-serving nature of affidavits ... serve to make such evidence inherently infirm." *Stewart v. Rise, Inc.*, 791 F.3d 849, 860 (8th Cir. 2015). Rather, "[w]e may discount a plaintiff's self-serving affidavit" only "where it clearly contradicts the plaintiff's earlier testimony under oath and where the plaintiff offers no explanation for the inconsistencies." *Id.* at 861. This is because the "Federal Rules of Civil Procedure expressly contemplate the use of affidavits ... and declarations as permissible forms of evidence at the summary judgment stage." *Id.* at 860. Unlike the "mere allegations" of an unsworn pleading, the statements in Hamby's declaration are "probative evidence." *Wilson v. Miller*, 821 F.3d 963, 970 (8th Cir. 2016) (cleaned up); *see also* Fed. R. Civ. P. 56(c)(1)(A); 28 U.S.C. § 1746.

*Id*. Accordingly, the Court cannot simply discount Plaintiff's entire affidavit on the basis that it is self-serving.

The specific assertion within the affidavit regarding Summers is problematic for other reasons. Because no information regarding Summers was provided to Defendant via Plaintiff's Amended Complaint, Plaintiff's Rule 26 disclosures, or during discovery, Plaintiff is precluded from using this information as evidence in opposition to Defendant's motion, unless inclusion would be harmless. *See Schuller v. Great-W. Life & Annuity Ins. Co.,* No. C-04-62-LRR, 2005 WL 2257634, at *6 (N.D. Iowa Sept. 15, 2005) ("Federal Rule of Civil Procedure 37(c)(1) enforces Rule 26(a) by providing that '[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.'") (quoting Fed. R. Civ. P. 37(c)(1)); *see also* Fed. R. Civ. P. 26(a)(1)(A)(i) (providing that a party must provide to the other parties in initial disclosures "the name and, if known, the address and telephone number of each individual likely to have discoverable

information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses.”).

Plaintiff’s belated inclusion of Summers would also violate the Court’s scheduling Order that imposed a January 15, 2026 discovery deadline (Doc. 22). *See Schuller*, 2005 WL 2257634, at *6 (“Federal Rule of Civil Procedure 16 ‘gives the district court the authority to set management deadlines and to impose sanctions for their violation,’ . . . [t]herefore, ‘the rules thus permit a court to exclude untimely evidence unless the failure to disclose was either harmless or substantially justified.’”) (quoting *Trost v. Trek Bicycle Corp*., 162 F.3d 1004, 1008 (8th Cir.1998)).

Plaintiff’s failure to disclose Summers was not justified, and Plaintiff includes no explanation for failing to do so. Plaintiff’s inclusion of the information at this juncture certainly prejudices Defendant, as Defendant was not able to conduct any discovery with respect to Summers, was not able to depose Summers, nor was Defendant able to ask Plaintiff about her knowledge of Summers or any other relevant information about him, during Plaintiff’s deposition. Defendant relies on and argues in its Motion for Summary Judgment that there is a lack of evidence showing non-disabled individuals were treated differently. Defendant would be prejudiced if the Court were to allow Plaintiff’s dubious effort to include evidence of or about Summers, for the first time, in her response to Defendant’s motion. Accordingly, the portion of Plaintiff’s affidavit setting out facts regarding Summers will be excluded.

Notably, even had the Court determined it would consider the facts about Summers, the information included in the affidavit is insufficient to create a genuine issue of material fact. Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that an affidavit used to oppose a motion for summary judgment “must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c). "Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge. . . . An affirmation on 'information and belief' is insufficient." *Epstein Constr., Inc. v. Mod. Piping, Inc.*, No. 19-CV-106-CJW-KEM, 2022 WL 407382, at *4 (N.D. Iowa Feb. 9, 2022) (internal citation and quotation omitted); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1367 (8th Cir. 1983) ("an affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; information and belief is insufficient.").

Plaintiff's statement regarding Summers is based on "the best of [her] knowledge and belief," but does not set forth adequate factual support to show she possesses that knowledge, nor does it contain enough facts about Summers for the Court to determine he was "similarly situated" to, or not subjected to, rules that purportedly applied to Plaintiff (*see* Doc. 53-7 at 1). Beyond providing his name, Plaintiff provides no other factual details about Summers, including how he was similarly situated to Plaintiff, his disability status or lack thereof, any interactions he had with Pugel or Coughran, any requests he made to delay or reschedule tests, and any circumstances in which he was or was not required to complete a missed test within a 12-hour time frame or provide a doctor's note. *See, e.g.*, *Berg v. Norand Corp.,* 169 F.3d 1140, 1146 (8th Cir. 1999), *cert. denied,* 528 U.S. 872 (1999) (determining plaintiff failed to defeat summary judgment on her claim under the Equal Pay Act, where plaintiff's conclusory affidavit testimony comparing herself with male managers failed to articulate which particular male managers had jobs similar to hers, or how the males compared in experience, education, and training). Accordingly, the Court's consideration of the information regarding Summers would not suffice to create a genuine issue of material fact upon which the Court would deny summary judgment.

The following statement of undisputed material facts is set forth in accordance with these rulings.

**IV. Undisputed Material Facts**[2]

Plaintiff Chasity Rodgers was enrolled at STLCC in the FSE program during Fall 2023 and Spring 2024. In June of 2023, prior to the fall semester, Rodgers sought academic accommodations from STLCC's Access Office by filing an "Application for Services" (Doc. 47-3). Plaintiff's disabilities included ADD/ADHD, anxiety, and panic attacks (*id*. at 1). Plaintiff requested the following accommodations: a designated quiet work space; allowance for needed breaks to calm; seating close to the instructor; and extra time to complete assignments and notes (*id*. at 2).

Telitha Rogers-Anderson ("Rogers-Anderson"), the manager of STLCC's Access Office and Plaintiff's assigned advocate for her disability accommodations, approved her accommodation request (Doc. 47-2 at 3-4). Rogers-Anderson was Plaintiff's "access specialist" or "access contact," responsible for approving and updating her accommodation requests (*id*. at 4). She was available to Plaintiff to answer any questions Plaintiff might have about her accommodations or how to implement them (*id*.).

Coughran and Pugel (collectively "professors" or "instructors") taught all of the FSE courses at STLCC. A "Notification of Accommodations" dated August 23, 2023, which Rogers-Anderson sent to Plaintiff's professors, documented Plaintiff's approved requests, and the extension of additional instructional, testing, environmental, and equipment accommodations and

---

[2] In accordance with the rulings above, the undisputed facts set forth by the Court are from the allegations in Plaintiff's Amended Complaint to the extent they are admitted by Defendant in its Answer thereto; from the properly supported statements of uncontroverted material facts supporting the summary judgment motion and response thereto, to the extent they are admitted by the opposing party, or to the extent they are deemed admitted for being improperly disputed; and from the uncontradicted record.

adjustments (Doc. 47-3 at 4). The "Instructional Accommodations" included the following, "[s]tudent may experience disability-related absences. Please refer to the absence recommendations found in the Access Office Student Handbook." *Id.* The "Testing Accommodations" included time and a half for tests and quizzes, and an out-of-class, quiet distraction-reduced environment with minimal interruptions (*id.*). The "Environmental Adjustments" included preferential seating in front of class and an allowance to leave the classroom for a period of time (*id.*). The "Equipment" section noted that she "[n]eeds to record lectures as a form of notetaking." *Id.* The Notice also included the following:

> • A student who receives accommodations should be held to the same grading and behavior standards as other St. Louis Community College students.
> • Students do not need to disclose their disability to instructors, and it is inappropriate to ask.
> • This information is confidential and should not be shared with any person other than the student.
>
> The Access Office staff is committed to working with you in maintaining the integrity of the educational experience and in creating equal access opportunities. Please let us know if you have any questions.

*Id.* at 5. Rogers-Anderson explained the first bullet point meant "[t]hat accommodations are provided to students so that they have an equal access to the course material, but they still have to meet the same standards and guidelines of the other students, other students that don't have accommodations." Doc. 47-2 at 35.

Plaintiff passed all of the courses she took in Fall 2023 with Drs. Coughran and Pugel. The same accommodations from the fall semester were approved for the Spring 2024 semester, as reflected in the "Notice of Accommodations" dated January 12, 2024 (Doc. 47-3 at 6). Throughout both the fall and spring, in accordance with the testing accommodations, Coughran

and Pugel sent a copy of each quiz and exam to the STLCC Testing Center,[3] where Plaintiff was to schedule a time to take each test at "the regular time" the rest of the class was administered the quiz or test, unless the Plaintiff had a medical concern[4] (Doc. 47-2 at 13). Students in the FSE program[5] without disability-related accommodations were required to take tests in the classroom as scheduled.

Beginning in the fall semester, and continuing into the spring semester, Pugel asked Plaintiff, on several occasions, in front of the class, whether she wanted to take a quiz or test in the testing center, although he did not describe the symptoms of her disability or nature of her disability (Doc. 47-1 at 15). On at least one occasion he posed the same question to another student (*id.*). Plaintiff, at some point, took a quiz or test in a conference room near her classroom (Doc. 47-2 at 20).

Plaintiff did not complain to anyone about these instances during the fall, though Plaintiff eventually notified Rogers-Anderson and later filed a formal complaint based on this conduct. Plaintiff testified she was discouraged by Pugel from utilizing the testing center, and explained he would say that "we should take [the quiz or test] up here, up in the class. He said, we should take it in the classroom because he can help – he can help us from up here." Doc. 47-1 at 16. Plaintiff testified that she preferred to take tests in the testing center, and although she felt

---

[3] Defendant's statement that the instructors sent a copy of each quiz and exam to the testing center is "controverted" by Plaintiff, but Plaintiff states nothing actually controverting this portion of the fact statement (Doc. 53 at 4-5). This fact is therefore deemed admitted.

[4] Plaintiff attempts to dispute this fact by stating that the testimony is asserted out of context, and arguing that the application of the 12-hour test rule was never explained or related to a "flare or medical concern" (Doc. 53 at 4-5). An email from Pugel described the deadline accommodation extension and specifically stated, "[i]n the event of a medical concern or crisis, you need to inform us and provide a doctor's excuse" (Doc. 47-10). Plaintiff's response is improper and does not appropriately controvert Defendant's statement of fact, and this fact is deemed admitted.

discouraged from going to the testing center, Pugel never told her that she could not take a test in the testing center (*id.*). Plaintiff further affirmed that by "discouraging," she meant that he was suggesting for her to stay in the classroom, and not saying she could not go to the testing center (*id.* at 16-17).

Plaintiff also testified that on February 14, after Pugel asked her in front of the class if she wanted to take a quiz in the conference room or testing center, she pulled him to the side and informed him that she was embarrassed and frustrated by him doing that, and she asked him to stop (*id.* at 17). According to Plaintiff, after this date, Pugel did not ever again ask her where she wanted to take a test or quiz (*id.*). Plaintiff testified that throughout the fall and spring semesters she missed quizzes and tests, she was always allowed to make them up, and she was never denied a makeup quiz that she missed in Spring of 2024 (*id.* at 18).

On February 14, 2024, Plaintiff contacted Rogers-Anderson to make a complaint about Pugel discussing Plaintiff's testing accommodations in class (Doc. 47-2 at 30). Several emails amongst Plaintiff, her professors, and Rogers-Anderson document relevant communications after that date, all of which occurred in 2024. On February 15, Rogers-Anderson emailed Coughran and Pugel individually, recommending and encouraging that they have the testing center proctor students' exams to ensure accommodations are implemented accurately, and informing them that administering test accommodations in an alternative setting can violate a student's confidentiality rights, even if the student agrees to the arrangement (Docs. 47-6, 47-7). Neither Plaintiff nor any other student was named in these emails (*id.*).

On February 20, Coughran responded to Rogers-Anderson that there are "significant problems with Chasity Rodgers not taking her tests on time. There are always excuses of why

[5] The FSE program had less than twenty students enrolled in the Spring 2024 semester (Doc. 47-1 at 16).

she can't take the tests in a reasonable time." Doc. 47-7 at 1. On February 21, Rogers-Anderson responded to Coughran that they should meet to discuss the matter and establish guidelines (*id.*). On the same date, Rogers-Anderson emailed Plaintiff and Coughran, suggesting a meeting between Coughran, Rogers-Anderson, and Plaintiff to discuss test accommodations and guidelines surrounding retests (Doc. 47-8 at 2). A meeting was set for the three of them to meet the following Tuesday (*id.* at 1).

At approximately 3:00 p.m., on Monday, February 26, the day before the meeting, Plaintiff emailed Rogers-Anderson, informing her that Pugel told her after class that Coughran had invited Pugel to the Tuesday meeting, that she took issue with this because Pugel is a cause of anxiety for her, that she would have declined a meeting including Pugel, and would have felt ambushed had she not been informed (Doc. 47-9 at 2). Plaintiff sent another email at approximately 7:30 a.m. the next morning, asking Rogers-Anderson to call her (*id.*). Rogers-Anderson responded around 9:00 a.m., informing Plaintiff she was in meetings until the afternoon, and that she could call Plaintiff after 1:00 p.m. (*id.* at 1). A few minutes later, Plaintiff responded that she did not know how to navigate the situation, that the meeting was scheduled for 11:30 a.m. that morning, that she did not agree to meet with Pugel, but he was invited by Coughran, and that she wanted confirmation prior to the meeting because she would be traveling from Illinois to attend (*id.*). Rogers-Anderson replied, copying Coughran, that Plaintiff can share her concerns regarding Pugel's attendance at the meeting, and she was sure Coughran would take her wishes into consideration (*id.*). Plaintiff did not attend the meeting.

The same day, around 12:30 p.m., Pugel emailed Plaintiff, copying Rogers-Anderson and Coughran, listing five quizzes plaintiff needed to complete by March 1 at 5:00 p.m. (Doc. 47-10 at 2). Although one listed quiz was from a class Plaintiff was not enrolled in, the other quizzes

had been administered on February 7, two on February 21, and one scheduled for February 28 (*id.*). The email stated that the quizzes had been in the testing center from the original date to complete, and also stated:

> Moving forward for future quizzes you have a deadline extension accommodation of 12 hours, if not completed with [sic] the time frame you can possibly receive a zero.
>
> In the event of a medical concern or crisis you need to inform us and provide a doctor's excuse. It's not uncommon for us to ask for a doctor's note.
>
> Please keep us informed.

(Doc. 47-10 at 2).[6] Less than ten minutes later, Plaintiff responded "I understand. Thank you." *Id.*

Also around 12:30 p.m. that day, Coughran emailed Plaintiff acknowledging his awareness that she has "some concerns regarding Dr. Pugel," and providing her a link to file a complaint (Doc. 53-4). Coughran then reminded her that she was scheduled to take a Restorative Art Mid-Term that Wednesday, March 6, at 12:00 p.m (*id.*). He further stated, "Going forward we will provide an accommodation of an additional 12 hours to complete all tests and quizzes. If you do not take the test by the accommodation deadline, you will receive a zero." *Id.* About ten minutes later, Plaintiff responded, "Thank you for letting me know." *Id.*

About thirty minutes after that, Plaintiff sent another email to Pugel, Coughran, and Rogers-Anderson, thanking all of them for their help with the situation and clarifying that she has twelve hours to complete the quizzes and asking when it is required for her to have a doctor's excuse (Doc. 47-10 at 1-2). At approximately 8:30 a.m. the next morning, February 28, Rogers-Anderson responded with the following:

[6] The Court refers to the 12-hour extension to Plaintiff's accommodation as the "12-hour rule" throughout this opinion.

> The Access Office has your medical information, which is not shared; however, it is used to continue your accommodation of Attendance/Deadline extension. Attached is the Attendance/Deadline modification policy and agreement. The policy does state in the section, "student needs to know," that instructors have the right to request a doctor's note to verify the absence. Instructors do not have the right to obtain medical information.
>
> I am available to meet with you and your instructor to discuss the policy if you have questions.

(*id.* at 1). Rogers-Anderson had also sent an email to Plaintiff and Pugel at approximately 4:15 p.m. on February 27, with the subject "Attendance and Deadline modification policy and agreement," with a blank Attendance Agreement Form and Attendance and Deadline Modifications documents attached (Doc. 47-11). Within this email, Rogers-Anderson explained that the policy and agreement were attached, and that "[t]he agreement is a tool to provide guidance, minimize confusion and encourage communication. [sic] between the student and faculty regarding course expectations." *Id.* at 1. She requested that Plaintiff and Pugel review it and contact her with any questions (*id.*).

On Thursday, February 29, Plaintiff sent an email to Rogers-Anderson and Pugel, and copying Coughran, requesting confirmation that they "are on the same page for quizzes that are to be made up deadline March 1st @ 5:00 p.m." (Doc. 47-10 at 3). Plaintiff listed seven quizzes that needed to be made up, including:

> Embalming Chemistry:
> Quiz 2/8
> Quiz 2/22
>
> Pathology:
> Quiz 2/7
> Quiz 2/21
>
> Embalming II:
> Quiz 2/7
> Quiz 2/21
> Quiz 2/28

(*id*.). Plaintiff stated she would begin testing in the Testing Center the following day, and requested confirmation that all of the quizzes had been sent to the Testing Center (*id*.). A few hours later, Rogers-Anderson emailed Plaintiff, copying Coughran and Pugel, thanking her for bringing the information to Pugel's attention (*id*.).

On Friday, March 1, at 12:39 p.m., Plaintiff emailed Rogers-Anderson, Pugel, and Coughran, that her makeup quizzes were scheduled for 10:00 a.m. and 2:00 p.m. that day, but she was en route to the emergency room with severe chest pains, noting she was unsure whether the cause was due to her condition or something else (Doc. 47-12). She stated she would "send the Notice" as soon as she is released from the hospital (*id*.). Plaintiff requested to have all quizzes rescheduled for the following Monday morning, and stated that she would notify them if she was admitted to the hospital (*id*.).

On Tuesday March 5, at 9:00 a.m., Plaintiff emailed Pugel and Coughran that as of the previous day, all of her makeup quizzes were completed (Doc. 47-13 at 1). She noted that she was scheduled to take her Pathology and Embalming II midterm exams on that day (*id*.). She stated that she had intended to complete the quizzes the prior Friday, before she became ill, and she thought the quizzes would be graded by Monday so she would know what she needed to study to be successful for the exams on Tuesday (*id*.). She also stated that since she just took the quizzes on Monday, she was "not sure as to what is correct, and what I need to focus on for the Mid-terms" (*id*.). She then asked permission to receive her graded quizzes that day, Tuesday, and be allowed to take the Pathology and Embalming II midterms the next day, Wednesday, and that all other midterms would be completed as scheduled (*id*. at 2). She stated, "If unforeseen circumstance [sic] occurs, I will notify both of you as agreed" (*id*.). She also asked that Pugel let her know when she could pick up the graded quizzes (*id*.).

Soon after, at 9:25 a.m., Coughran responded with the following:

> MS. RODGERS,
> THIS IS MID-TERM WEEK.
> YOUR TEST WAS SCHEDULED FOR YESTERDAY!
> AS YOU KNOW THE RULES AS WELL AS WE DO, YOU KNOW THAT YOU WILL NEED A DR'S REPORT TO DISMISS YOU FROM YESTERDAY AND WILL ALLOW YOU TO TEST TODAY WITHIN THE 12 HOUR TIME LIMIT.
> IF NOT THEN YOU WILL NOT BE ABLE TO TAKE THE EXAM, THEREFORE NOT ABLE TO TAKE YOUR EXAMS
> YOU MUST ACT WITHIN THE RULES OF OUR SPECIAL CONTRACT AN [sic] THUS FAR YOU SEEN [sic] TO BELIEVE THE RULES NO ONE ELSE IS PRIVY TOO, MEANS VERY LITTLE TO YOU AND IS NOW BECOMING A BURDEN ON THE PROGRAM ITSELF.
> THIS WEEK IS VERY IMPORTANT TO ALL OF US AND TRULY HAS NO TIME FOR
> THOSE UNWILLING TO FULFILL
> THIER OWN OBLIGATIONS!
> THIS IS THE BEST THAT CAN OR EVEN WILL BE DONE.
> YOU MUST MEET THE REQUIREMENTS OF YOUR CONTRACT!

*Id*. at 1. Pugel was copied on the email (*id*.).

Plaintiff forwarded this email to Rogers-Anderson, stating she would call her to discuss it "shortly" (*id*.). The next email is again from Plaintiff, sent on Tuesday, March 5, to Rogers-Anderson, Coughran, and Pugel, at 3:27 p.m., with a doctor's note attached, stating that she may not return to school until March 7 (Doc. 47-14). She requested that the Embalming II and Pathology midterms be extended to Thursday, and Restorative Art and Embalming Chemistry midterm exams be completed on Friday (*id*.). Plaintiff requested to be updated upon receipt of the email so she could make the necessary arrangements with the Testing Center (*id*.). At some point on Tuesday, March 5, Plaintiff met with Rogers-Anderson (*see* Doc. 47-15 at 1).

On Thursday, March 7, at approximately 8:20 a.m., Rogers-Anderson emailed Plaintiff, with Coughran and Pugel copied, thanking her for sharing the doctor's note and informing her that the testing center could proctor her exams that day during their open hours, and for Plaintiff

to confirm with the faculty (Doc. 47-14). Later that same day, however, Plaintiff requested an additional extension. At approximately 2:20 p.m., Plaintiff emailed Rogers-Anderson, thanking her for meeting with her on Tuesday, and noting that she went to the ER after leaving STLCC that day, despite having an appointment scheduled with her primary physician the following day (Doc. 47-15 at 1). She stated that the ER physician advised her to take the rest of the week off due to the severity of her condition, but she informed the physician she needed to take her exams, and she was authorized to return to school on Thursday (*id.*). She explained she had an appointment with her primary physician about her conditions, asked him to provide additional documentation, to which her replied that the form he completed should suffice and to follow up with him after her meeting with STLCC President Julie Fikas ("Fikas") (*id.*).

Plaintiff further explained that during the meeting with Fikas that morning and leading up to it she felt extremely anxious and overwhelmed, began to feel short of breath and anxious at the meeting, as she had at the previous meeting with Rogers-Anderson, and she had difficulty articulating, but that it was a successful meeting nonetheless (*id.*). Plaintiff noted that during the meeting, she was given the opportunity to explain herself, she provided copies of supporting documentation, and noted that Fikas commended her on having everything together and organized (*id.* at 1-2). The meeting concluded with Fikas instructing Plaintiff that she needed to use the link that Rogers-Anderson sent her that Tuesday to make a formal complaint (*id.* at 2).

Plaintiff further explained that upon returning home, she followed up with her primary care physician, who thought it would be in her best interest to regroup from the week, and she attached documentation the physician instructed her to provide to them (*id.*). Plaintiff expressed that she was no longer comfortable advocating nor did she feel safe doing so with respect to her instructors, and asked that Rogers-Anderson send the information from the doctor to them (*id.*).

She noted she would be completing the complaint form and asked Rogers-Anderson to call her (*id.*). The doctor's note stated that Plaintiff "has been having an exacerbation of her underlying mental health problem precluding optimal academic performance" (*id.* at 4). The doctor stated he encouraged "the school administration to afford her every allowance possible to delay testing to permit her to recover from this current exacerbation." *Id.*

The following Monday, March 11, at 8:20 a.m., Rogers-Anderson responded to Plaintiff that she received her email and would share the doctor's note with the faculty (*id.* at 1). Four minutes later, Roger's Anderson emailed Pugel and Coughran, sharing Plaintiff's doctor's note (*id.* at 3).

On March 12, Plaintiff filed an internal discrimination complaint against Coughran and Pugel, noting an incident date of March 7, and alleging, among other things, discrimination based on Coughran's March 5 email stating Plaintiff was becoming a burden on the program and Pugel asking Plaintiff about testing accommodations in front of other students (Doc. 47-16 at 2). In the complaint, Plaintiff explained that beginning in the fall of 2023, Pugel disclosed her disability[7] and accommodation in front of the entire class by asking whether she and another classmate would be testing in the Testing Center, and discouraging them from doing so, and noting that he would often say, "If you take your quizzes up here, I can help you." *Id.* She believed she did not do as well on those quizzes because she required a quiet testing space and Pugel would often begin lecturing while she was still taking the quiz, ruining her concentration (*id.*). She reported she was afraid to report it out of fear of retaliation, but it continued "well into" the spring semester (*id.*).

On Thursday, March 14, Rogers-Anderson emailed Plaintiff the following:

[7] Plaintiff clarified during her deposition that Pugel did not disclose her disability, only

> I hope you are feeling better. Per your doctor's note on 3/7/2024, you requested a "delay in testing" to recover, which was acknowledged. As this request has been honored, we ask that you provide a letter from your medical provider indicating the date you can resume normal academic responsibilities. The date will be shared with faculty to schedule necessary quizzes, exams, etc.
>
> The college will be closed on Friday March 15, but will reopen on March 18th, 2024.
>
> Thank you and have a great weekend.

(Doc. 47-15 at 5). The same day, Rogers-Anderson emailed Pugel and Coughran, informing them she asked Plaintiff to provide a doctor's note releasing her to return to normal school activities, including test-taking, and that she would share the note once received (*id*. at 6). Rogers-Anderson again emailed Plaintiff on Wednesday March 20, at 8:14 a.m.:

> I hope you are feeling better. Per our conversation on Monday (3/18/2024), your doctor's note from 3/7/2024 requested a "delay in testing" to recover, which was acknowledged. As this request has been honored, we ask that you provide a letter from your medical provider indicating the date you can resume everyday academic responsibilities. The date will be shared with faculty to schedule necessary quizzes, exams, etc.

(Doc. 47-15 at 7). Pugel and Coughran were copied on the email (*id*.).

On Monday, March 25, Plaintiff emailed Rogers-Anderson that she will return to STLCC on Tuesday, March 26, although "due to a miscommunication," the letter released her to return that day, March 25 (*id*. at 8). On Tuesday, March 26, Rogers-Anderson emailed Pugel and Coughran that she received a letter from Plaintiff's doctor releasing her to return and asking them to reiterate with her their expectations regarding the remaining assignments, exams and projects due for the semester (*id*. at 10). Plaintiff was copied on the email (*id*.). The final email provided is dated April 12, from Rogers-Anderson to Plaintiff, asking if she had an opportunity

---

her testing accommodation.

to meet with the Dean about her concerns, and noting that the matter was time-sensitive given that the end of the semester was approaching (*id*. at 11).

Meanwhile, with regard to the complaint Plaintiff filed with STLCC on March 12, the Office of Student Responsibility & Community Standards and Title IX Director, Shannon Nicholson ("Nicholson"), was tasked with investigating Plaintiff's complaint, and assigned Summer Mattina ("Mattina"), a Coordinator with Student Rights and Responsibilities, to do the same (Doc. 47-16 at 2). From March 13 to April 1, Mattina contacted Plaintiff five times via email and text to meet with Plaintiff to discuss her concerns and desired outcomes (Docs. 47 at 6, 47-18). Plaintiff eventually responded on April 1 (Doc. 47 at 7). Between April 1 and April 3, Plaintiff and Mattina exchanged emails regarding meeting on April 5 (*id*.). Plaintiff told Mattina she would meet if she had permission to "have representation" present, to which Mattina responded that Plaintiff's attorney or anyone else could be present at the meeting, but it was Defendant's policy that any support individual cannot ask or answer questions on Plaintiff's behalf during the meeting (*id*.). Plaintiff did not respond to Mattina's April 3 email (*id*.).

On April 2, Rogers-Anderson called Plaintiff, and Plaintiff informed her she was meeting with the Dean, Dr. William Hubble ("Hubble") that Friday (Doc. 47 at 7). On April 10, Nicholson emailed Plaintiff that her complaint was going to be closed because it had been more than 20 business days since she filed the complaint, and per Defendant's procedure, resolution efforts should not exceed 20 business days (Doc. 47-19 at 2). The email references the fact that Plaintiff had told Mattina on April 3 that she would not attend the April 5 meeting (*id*.). On April 11, Plaintiff responded that her decision not to attend the meeting should not be interpreted as a change in her beliefs about the legitimacy of her complaint (*id.*). She claimed she was not permitted to have actual representation at the meeting beyond personal support, and that is why

she decided not to attend (Doc. 47-19 at 1). On April 12, Nicholson responded that she could schedule a meeting virtually or in person and could invite Hubble to the meeting (*id.*). Nicholson provided Plaintiff with links to various procedures available to her, and expressed the desire to support her in identifying the appropriate procedure to address her concerns (*id.*). The links were for three Administrative Procedures, including "Grievance Process for Student Equity Complaints," "Academic Appeals Procedure," and "Complaints from Students Concerning Employees" (*id.*). Plaintiff did not respond to Nicholson's email (Doc. 47 at 8).

On April 12, Rogers-Anderson emailed Plaintiff, asking her if she met with Dean Hubble, and indicating that, with the semester ending soon, it was a time sensitive matter (*id.*). Plaintiff did not respond to Rogers-Anderson's April 12 email (*id.*).

Plaintiff admits that from Plaintiff's return from medical leave on March 26, 2024, until the end of the semester, Plaintiff never contacted Coughran, Pugel, the testing center, Dean Hubble, or any other STLCC personnel to arrange the completion of her makeup exams, quizzes, or other coursework to graduate from the FSE program (*id.*).

Upon return from medical leave and until the end of the semester, Plaintiff attended very few classes in the program (*id.*). Students without accommodations could be dropped from the program for missing over three classes (*id.*).

## V. Discussion

### A. Title II Disability Discrimination (Count III)

In Count III, Plaintiff brings a discrimination claim under Title II of the ADA. "Title II of the ADA states in pertinent part: 'No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.'"

*Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) (quoting 42 U.S.C. § 12132). To establish a violation of Title II of the ADA, Plaintiff must demonstrate: (1) she is a qualified individual with a disability; (2) she was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the entity; and (3) that such exclusion, denial of benefits, or other discrimination, was by reason of her disability. *Id*. "A plaintiff alleging discrimination under Title II of the ADA may premise their case on three different theories: disparate treatment, disparate impact, or failure to accommodate." *Audette v. Lake of the Woods Cnty*., No. 24-CV-944 (LMP/LIB), 2025 WL 1736932, at *4 (D. Minn. June 23, 2025), *aff'd*, 183 F.4th 627 (8th Cir. 2026).

The claims in Plaintiff's Amended Complaint lack specific labels, but Defendant understands them to contend that STLCC violated the ADA by failing to accommodate her disability and by treating her disparately because of her disability. In her Response, Plaintiff does not dispute Defendant's characterization of her claims, and the Court will consider them as such. The parties do not dispute that Plaintiff has a disability or that STLCC is a public entity.

In the Eighth Circuit, failure to accommodate claims are evaluated under a "modified burden-shifting analysis" while disparate treatment claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004). The Court will first consider whether Defendant is entitled to summary judgment for the failure to accommodate claim and then consider the same for the disparate treatment claim.

**1. Failure to Accommodate**

The ADA requires a public entity "to modify its program to accommodate the needs of a disabled person unless such a modification will substantially alter the nature of the program or such a modification constitutes an undue burden." *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1028

(8th Cir. 1999). "'Failing to make a reasonable accommodation constitutes discrimination.'" *Audette*, 183 F.4th at 635 (quoting *Mobley v. St. Luke's Health Sys., Inc.*, 53 F.4th 452, 456 (8th Cir. 2022)). In other words, STLCC failed to accommodate Plaintiff "if it did not make reasonable modifications that would accommodate her disability." *Florek v. Creighton Univ.*, No. 25-1092, 2026 WL 2795824, at *3 (8th Cir. Sept. 18, 2026) (internal quotation omitted). Defendant is not required to provide Plaintiff "her preferred accommodation, but merely a reasonable one that provides meaningful access to the public entity." *Audette*, 183 F.4th at 635 (internal quotation omitted). Plaintiff must show that accommodations offered by Defendant were not reasonable, and that she was unable to participate equally in the FSE program. *Id.* Further, "[w]hen the accommodation involves an academic decision, '[courts] should show great respect for the faculty's professional judgment.'" *Amir*, 184 F.3d at 1028 (quoting *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985)).

Plaintiff's failure to accommodate claims are comprised of two core contentions: (1) Defendant granted and then discouraged and ultimately revoked an accommodation to take tests in the testing center, via the 12-hour rule, and (2) denied her request to reschedule her midterms. The Court will discuss each contention, in turn, below.

**a. Testing Center Accommodation**

Defendant asserts it is entitled to summary judgment on this claim because it granted every educational accommodation Plaintiff requested, and there is no evidence that it failed to provide any reasonable accommodation that would have helped Plaintiff complete her coursework and graduate from the FSE program (Doc. 46 at 1-2). Defendant highlights Plaintiff's deposition testimony confirming that she never formally or informally requested any

accommodation that was denied by Defendant[8] (*id.* at 5). Plaintiff responds that Defendant failed to accommodate Plaintiff through Pugel's "encouragement" to take tests or quizzes outside of the testing center, through his disclosure of her disability accommodation, and by imposing the 12-hour rule after Plaintiff complained to Rogers-Anderson about Pugel's conduct. Plaintiff also argues that Plaintiff's testimony stating she was never denied an accommodation she requested is "argued out of context" (Doc. 52 at 6). The Court agrees with Defendant that it is entitled to summary judgment on these claims.

The undisputed evidence shows that Pugel asked Plaintiff whether she wanted to utilize the testing center, or use a nearby conference room, or stay in the classroom so that he could assist her during the test. For certain quizzes or tests, Plaintiff agreed to take them in the classroom or conference room. After Plaintiff told Pugel and Rogers-Anderson she wanted him to stop asking in front of her classmates, he did so. It is undisputed that Pugel never denied Plaintiff the ability to utilize the testing center. Further, Pugel's disclosure of Plaintiff's accommodation, while potentially a breach of privacy, is not a failure to accommodate. Viewing the evidence in the light most favorable to Plaintiff, a jury could not find that Plaintiff's test center accommodation was denied on the basis of Pugel's conduct.

To the extent Plaintiff argues that the 12-hour rule was a denial of a reasonable accommodation, her argument is unavailing. The evidence shows that after Plaintiff missed at least six quizzes in the spring semester, a meeting was held to address issues with Plaintiff failing to take her quizzes and tests at the time they were administered to the class or within a reasonable time after. Plaintiff was invited to attend but declined due to Pugel's expected

[8] Plaintiff affirmed this during her deposition, when she responded, "No," to the question, "Did you ask, either formally or informally, for any accommodation that was denied by the college?" (Doc. 47-1 at 13).

presence at the meeting. After the meeting, Pugel notified Plaintiff that she would be granted an *extension* on her accommodation to allow her an additional twelve hours beyond the time the test or quiz was administered to the class, to complete the test or quiz. If Plaintiff needed an extension beyond that, she would need to provide a doctor's note. Coughran's post-meeting email also explained Plaintiff would be provided "an additional 12 hours to complete all tests and quizzes," and that if she did not take the test by the deadline, she would receive a zero.

Plaintiff repeatedly attempts to frame the 12-hour test rule as a revocation of her testing accommodations, but the undisputed evidence shows that the instructors had repeatedly allowed Plaintiff to take quizzes late, with no penalty, and ultimately her failure to timely complete the quizzes created issues for the instructors in the administration of their courses. Plaintiff has not shown that the rule was not reasonable. Further, the Court defers to the instructors' professional judgment in their decision to extend Plaintiff's accommodation or require a doctor's note if she needed additional time. *See Amir*, 184 F.3d at 1028.

Although Plaintiff attempts to argue there was no explanation of this rule and it conflicted with the test center's forty-eight hour advanced scheduling rule, Plaintiff, via email, expressed her understanding, and ultimately, was never given a reduced grade or denied the ability to take a quiz or test on this basis. Plaintiff has not shown that the 12-hour rule prevented her from participating equally in the program. Accordingly, Defendant did not fail to accommodate Plaintiff on the basis of imposing the 12-hour rule, and her claim on this basis fails.

**b. Rescheduling Midterms**

Plaintiff's argument that Defendant failed to accommodate by denying her request to reschedule her midterms is similarly unavailing. At the outset, the Court notes that Plaintiff's request to reschedule her midterms was not based on her disability, but, in Plaintiff's own words

in her email, she requested the extension based on her desire to have her belatedly-taken graded quizzes returned so that she could study from them prior to the midterms. Thus, while it is true Coughran responded to Plaintiff's email in a curt and unprofessional fashion, his response is not specifically tied to Plaintiff's disability. Likewise, Coughran's comments that Plaintiff's requests were "becoming a burden" were also in direct response to Plaintiff's last minute request to reschedule her midterms that she was supposed to take that day, on the basis of wanting her tests back first, not a request based on her disability. Further, despite Plaintiff's arguments to the contrary, Coughran's email did not deny Plaintiff the ability to reschedule her midterm, but on the face of the email reiterated that she would need to take it within twelve hours of it being administered to the class, or provide a doctor's report.[9] This is not a denial. Based on Plaintiff's next actions, Plaintiff did not proceed as if it was a denial, or that she believed it to be a denial, either.

The record shows that after Plaintiff received Coughran's email, she met with Rogers-Anderson to discuss it. Later that day, Plaintiff submitted a doctor's note stating she could not return to school until Thursday, March 7, and on this basis, requested additional extensions. On March 7, Rogers-Anderson responded that she could take the tests that day, and that the testing center could proctor her exams during their open hours (Doc. 47-14). Pugel and Coughran were copied on Rogers-Anderson's email. Plaintiff's request was clearly granted.

Plaintiff did not take her midterms on March 7, but after 2:00 p.m that day emailed Rogers-Anderson and provided a doctor's note requesting a further testing extension for medical reasons. Again, Plaintiff continued proceeding as though she believed the requests to be granted.

---

[9]Although Plaintiff attempts to argue the phrase used in Coughran's email requiring a "doctor's report" as opposed to a "doctor's note" was somehow discriminatory, the distinction is immaterial in this case as Plaintiff was never denied a request based on the format or substance of her communications she provided to Defendant from her doctors.

Rogers-Anderson unequivocally granted this additional extension as well, stating Plaintiff's requested was "acknowledged" and that "this request has been honored" (Doc. 47-15 at 5). In the same email, Rogers-Anderson also asked Plaintiff to provide a letter from her medical provider indicating the date she can resume normal academic activities. The undisputed evidence further shows Plaintiff's doctors' notes were provided to Coughran and Pugel, and that the instructors sent the tests to the testing center.

Plaintiff relies heavily on the language in Coughran's emails, which she claims led to her belief that she could not take the midterms or would receive zeroes. This argument is completely unsupported in light of the undisputed, objective record evidence. Rogers-Anderson's emails repeatedly affirmed Plaintiff could reschedule her midterms, and Plaintiff's own actions during that time period show that she was proceeding with the knowledge she could do so. Plaintiff has not raised a genuine issue of material fact that Coughran's emails foreclosed her ability to take her midterms and led to her ultimate failure of the program.

Plaintiff also asserts that the instructors' failure to reach out to her as Rogers-Anderson suggested after her return from medical leave amounted to a denial of her extension request. This is mere speculation on Plaintiff's part, and does not create a genuine issue of material fact in light of the overwhelming evidence that after she received Coughran's email, she provided a doctor's note that same day, and requested midterm extensions, received affirmation that her requests were approved, she continued to communicate with Rogers-Anderson about her return date through March 26, and attended classes in the month of April. The tests were at the testing center, and the instructor's never denied her the ability to take them.

Additionally, Plaintiff admitted that upon return from medical leave, she did not reach out to her instructors or the testing center to schedule any tests, and barely attended class.

Plaintiff has not raised a genuine issue of material fact that the professors' lack of response to Rogers-Anderson's request that they communicate with her foreclosed her ability to take her midterms and led to her ultimate failure of the program. Defendant did not fail to accommodate Plaintiff on the basis of failing to reschedule her midterms, and her claims on this basis fail.

Furthermore, it is of relevance here that in the employment discrimination context, if an individual rejects a reasonable accommodation that is necessary to enable the individual to perform the essential functions of a position, and as a result of that rejection, cannot perform the essential functions of the position, "the individual will not be considered qualified." *Allen v. Collins*, No. 1:24-CV-00019-SNLJ, 2026 WL 878607, at *8 (E.D. Mo. Mar. 31, 2026) (internal quotation omitted). In other words, the individual is no longer a "qualified individual" under the law, and an entity would no longer be required to provide the individual with a reasonable accommodation. *Id.* In the case at bar, Plaintiff did not do anything to attempt to reschedule her midterms, ultimately resulting in the failure of her courses. Plaintiff here essentially rejected the accommodations offered her, which would negate the "qualified individual" requirement for her to successfully bring a claim under the ADA. Were the Court to apply that analysis here, as urged by Defendant, it too would foreclose Plaintiff's ability to meet the elements of the claim, and result in summary judgment for Defendant.

**2. Disparate Treatment**

Defendant argues it is entitled to summary judgment on Plaintiff's disparate treatment claim because Plaintiff has not identified any adverse action taken by the Defendant and has not provided any proof of causation because she failed to show similarly situated non-disabled students were treated more favorably as required (Doc. 46 at 7-8). Defendant further asserts Plaintiff received failing grades because she failed to show up and make up the missed

coursework and complete the remaining coursework after returning from medical leave, not because of discrimination based on her disability. Defendant argues this non-discriminatory reason is legitimate, and there is no evidence of record that creates a genuine issue of material fact as to pretext.

Plaintiff summarily responds that there is direct material evidence of discrimination, but merely refers back to her failure to accommodate arguments to support this contention, stating "there is in fact direct evidence of discrimination and disparate treatment as stated in Plaintiff's Points I – IV previously stated under (1) hereinabove" (Doc. 52 at 10). Plaintiff argues the *McDonnell Douglas* burden shifting framework does not apply in this case, but after summarily arguing there is direct evidence, undertakes analysis pursuant to the framework nonetheless (*id.* at 9-10).

"In disparate treatment cases, a similarly situated disabled individual is treated differently because of his disability than less- or non-disabled individuals. The key element is discriminatory intent." *Peebles*, 354 F.3d at 766. At the outset, the Court disagrees that Plaintiff has provided direct evidence under the governing standard. The Eighth Circuit recently summarized:

> "Direct evidence is that which shows a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012) (citation modified). This "includes evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Lipp*, 911 F.3d at 543 (citation modified). Absent direct evidence, we look for indirect evidence. *Id.* at 544.
>
> The [Plaintiffs] argue that the Board meeting provided direct evidence of intentional discrimination. Intentional discrimination requires "more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). "It implies that

> the decisionmaker, in this case a state [board], selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id*. (citation modified).

*Audette*, 183 F.4th at 637.

The purported "direct evidence" Plaintiff raises in her previous arguments includes the following: Pugel encouraged her to take quizzes outside of the testing center; Pugel disclosed her testing accommodations; the 12-hour rule was implemented after Plaintiff complained about Pugel; Coughran responded to Plaintiff's email request to her extension to take her midterm exams in a "malicious" manner, stating that she needed a doctor's report and would need to test within the 12-hour time limit or she would receive a zero; the instructors "ignored" Plaintiff's March 5 email requesting they update her on receipt of her email so she could make arrangements with the testing center; and the instructors did not respond to Rogers-Anderson's email asking them to communicate their expectations regarding remaining assignments and exams. Plaintiff includes no legal analysis in this section of the brief as to how she believes any one of the above is direct evidence of discrimination under the law. The Court finds Plaintiff's examples of purported intentional discrimination, even viewed most favorably to Plaintiff, fail to show animus towards Plaintiff's disability status, and are not direct evidence of intentional discrimination. *See Audette*, 183 F.4th at 637.

Absent direct evidence, the Court analyzes this claim under the *McDonnell Douglas* burden-shifting framework. *Florek v. Creighton Univ.*, No. 8:22CV194, 2024 WL 4581466, at *17 (D. Neb. Oct. 18, 2024), *aff'd*, No. 25-1092, 2026 WL 2795824 (8th Cir. Sept. 18, 2026); *Power v. Univ. of N. Dakota Sch. of L.*, 954 F.3d 1047, 1052 (8th Cir. 2020). At step one, to establish a prima facie case, Plaintiff must show that (1) she was disabled, (2) she was qualified to complete the FSE program, and (3) Defendant took adverse action against her because of her

disability. *See id.* "At step two, [Defendant] must proffer a legitimate, nondiscriminatory reason for the adverse action." *Id.* For the third step, Plaintiff "must show evidence that [Defendant's] stated reason was pretext for discrimination based on her disability." *Id.* In order to prove pretext, Plaintiff must produce evidence that Defendant's stated reasons did not motivate its decision to take adverse action and her disability was the real reason. *Id.*

Defendant argues there is no evidence Defendant took *any* adverse action against Plaintiff whatsoever and she therefore fails to establish her prima facie case. Defendant argues the 12-hour rule was not an adverse action, nor did it impact any outcome for Plaintiff. Defendant also argues Plaintiff failed because she never showed up, followed up, or took her tests, and there is nothing in the record to even raise a genuine issue of material fact as to whether Defendant engaged in an adverse action against Plaintiff. In Plaintiff's Response, she argues that "Plaintiff failed her mid-terms because of the Defendant's refusal to respond to her March 5, 2024 email attempting to re-set the mid-terms for March 7 and 8, 2024" (Doc. 52 at 11).

The district court in *Florek v. Creighton Univ.*, No. 8:22CV194, 2024 WL 4581466, at *20 (D. Neb. Oct. 18, 2024) explored what constitutes adverse action for purposes of the prima facie case in light of the language of the statute, caselaw in the Eighth Circuit and other circuits, and Supreme Court precedent, and concluded that to meet the third element, Plaintiff "must show a 'difference in treatment that injured' her equal participation" in the FSE program. *Florek v. Creighton Univ.*, No. 8:22CV194, 2024 WL 4581466, at *20 (D. Neb. Oct. 18, 2024), *aff'd*, No. 25-1092, 2026 WL 2795824 (8th Cir. Sept. 18, 2026) (quoting *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 354-55 (2024)). In affirming the district court's decision, the Eighth Circuit Court of Appeals also described what was *not* an adverse action. *Florek*, 2026 WL 2795824, at *4, n.4. The Eighth Circuit acknowledged in that case, where a pharmacy school

student received professionalism citations and was ultimately dismissed from the university, plaintiff's other allegations of adverse actions that "included 'a range of instances of unequal treatment,' including things like faculty 'singling out [plaintiff]' or 'labeling her manipulative, unprofessional or irresponsible'" were not adverse actions based on her disability. *Id*. The Court reiterated that "'[a] person alleging discrimination under Title III must show ... that the defendant took *adverse action* against the plaintiff that was *based upon the plaintiff's disability.*'" *Id*. (quoting *Amir*, 184 F.3d at 1027 (emphasis included)).

Similarly, in the instant case, Plaintiff summarily refers to her arguments from the previous section to argue "Defendant clearly took adverse action against Plaintiff (for all the reasons set forth in I – VI under (1) herein above)" (Doc. 52 at 10). These general allegations of adverse actions including Pugel's conduct encouraging her to test in a conference room or classroom, his disclosure of her accommodation, and Coughran's curt email, are not adverse actions based on Plaintiff's disability in that there is no evidence her ability to participate was injured or that these actions were based on her disability. *See Florek*, 2026 WL 2795824, at *4, n.4.

To the extent Plaintiff argues the 12-hour rule constitutes an adverse action, the argument is unavailing. The implementation of the 12-hour rule is not an adverse action because Plaintiff has not shown a difference in treatment that *injured* her participation, nor that it was *based on her disability*. The 12-hour rule was an accommodation modification granting her additional time beyond the time the quiz or test was administered to other students. Further, Plaintiff provided no evidence that the 12-hour rule injured her participation, in that it never resulted in a reduced grade or in her inability to take a quiz or test.

Additionally, even assuming *arguendo* the 12-hour rule did constitute an adverse action, there is no evidence it was implemented *because of* Plaintiff's disability. Defendant's proffered reason for its implementation, that Plaintiff had already missed at least 6 quizzes, had not completed them at the time they were administered to other students, and waited weeks to complete them, led to the creation of the rule. The undisputed evidence supports these facts, and an email from Coughran to Rogers-Anderson specifically noted "significant problems" with Plaintiff "not taking tests on time" or even "in a reasonable time" (Doc. 47-7). Rogers-Anderson suggested a meeting including Plaintiff to "establish guidelines," and after that meeting the 12-hour rule was communicated to Plaintiff (*id*., Doc. 47-10 at 2). Plaintiff opted not to attend that meeting.

Finally, Plaintiff presented no evidence that Defendant's proffered reason is pretextual. Although Plaintiff attempts to include in her affidavit allegations that a student named Gerald Summers was not subjected to the 12-hour rule, the Court has determined it cannot consider this evidence. Even if the Court considered this fact, however, Plaintiff utterly fails to show that Summers was a similarly situated individual. *See Amir*, 184 F.3d at 1028 ("Although Amir alleges disparate treatment and cites instances where students were allowed to return to a clinic after hospitalization or where students were not dismissed after receiving a failing grade, he fails to show that these instances involved similarly situated individuals.").

After summarily asserting the arguments above, Plaintiff's main contention appears to be that the adverse action at issue is Plaintiff's failure of her midterms. This argument fails as well. Notably, Plaintiff argues she "experienced" the adverse action of failing her midterms because her professors did not respond to her March 5 email attempting to reset her midterms for March 7 and 8. The undisputed evidence shows however, as explored extensively *supra*, that the lack

of response did not, in fact, prevent Plaintiff from taking her midterms or cause her to fail. Plaintiff's midterms were available in the testing center, and Rogers-Anderson told her the testing center could proctor her exams on March 7, as she requested. Further, Rogers-Anderson's later emails confirm Plaintiff's March 5 request and additional extensions were granted.

Although Plaintiff attempts to raise a fact issue as to where Rogers-Anderson had the authority to grant test extensions, any assertion that she did not is based on mere speculation on the part of the Plaintiff. In Plaintiff's email communications, she never questioned Rogers-Anderson's authority to reschedule her midterms, even when she emailed solely Rogers-Anderson to request an additional extension. The evidence shows Rogers-Anderson was Plaintiff's primary contact throughout the Spring 2024 semester and repeatedly served as a go-between for Plaintiff's communication with her professors. Plaintiff sent all of her doctor's notes to Rogers-Anderson to share with her professors, and extensively met and communicated with her during the relevant period. Furthermore, Plaintiff has presented no evidence that her professors ever denied any attempts to reschedule or even disagreed with any extensions.

Although the instructors did not affirmatively reach out to Plaintiff upon her return from medical leave as Rogers-Anderson suggested, Plaintiff was never denied the opportunity to make up her tests. As noted above, Plaintiff's argued belief she could not take the test does not raise a genuine issue of material fact, especially in light of the extensive evidence showing she was granted test extensions and permitted to reschedule her tests. The objective, undisputed evidence shows the professors were copied on Rogers-Anderson's relevant emails, and the professors sent the tests to the testing center. Especially relevant here is that Plaintiff admits that upon return from medical leave, she did not reach out to her instructors or the testing center to schedule any

midterms, and barely attended class. No jury could find that the instructors' lack of response amounted to a difference in treatment that injured her equal participation in the FSE program. Ultimately, she was never denied the opportunity to take her midterms, but did not avail herself to do so, resulting in the failure of her courses. Defendant is entitled to summary judgment on Count II.

**B. MHRA Discrimination (Count I)**

In Count I, Plaintiff brings a discrimination claim pursuant to the MHRA. The Court agrees with the parties that discrimination claims under the ADA and the MHRA are "governed by the same standards." *Olsen v. Cap. Region Med. Ctr.*, 713 F.3d 1149, 1153–54 (8th Cir. 2013) (considering disability discrimination claims in the employment context). Because summary judgment is appropriate on Plaintiff's ADA discrimination claim, it is also appropriate on Plaintiff's MHRA discrimination claim. *See Darby v. Bratch*, 287 F.3d 673, 682 (8th Cir. 2002) (stating that "a claim under the MHRA is analyzed in the same manner as a claim under the ADA," and concluding that where summary judgment is appropriate on an ADA claim, it is appropriate on an MHRA claim). Accordingly, the Court will grant Defendant's motion for summary judgment as to Count I.

**C. MHRA Retaliation (Count II)**

In Count II, Plaintiff brings a retaliation claim pursuant to the MHRA. The MHRA "makes it an unlawful discriminatory practice 'to retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter.'" *Harrison v. Harris-Stowe State Univ.*, 626 S.W.3d 843, 857 (Mo. Ct. App. 2021) (quoting Mo. Rev. Stat. § 213.070). Plaintiff can "establish a case for retaliation under the MHRA by showing that: (1) she complained of or otherwise opposed discrimination; (2) the University took adverse

action against her; and (3) a causal relationship exists between the complaint and the adverse action." *Id.* (citing *McCrainey v. Kansas City Missouri Sch. Dist.*, 337 S.W.3d 746, 753 (Mo. App. W.D. 2011)). The Missouri Supreme Court has further explained:

> "'although federal law requires a retaliation claimant to demonstrate that an 'adverse employment action' has occurred ('adverse employment action' generally meaning some change in pay, benefits, seniority, responsibility, etc.,), the MHRA does not."' *Mignone v. Missouri Department of Corrections*, 546 S.W.3d 23, 36 (Mo. App. 2018) (quoting *Walsh v. City of Kansas City*, 481 S.W.3d 97, 106 (Mo. App. 2016)). "[A] plaintiff alleging unlawful retaliation need only establish that, as a direct result, he or she suffers any damages." *Id.* (internal quotation marks and citations omitted).

*Holmes v. Kansas City Pub. Sch. Dist.*, 571 S.W.3d 602, 612 (Mo. Ct. App. 2018). The underlying discrimination claim need not be successful for the retaliation claim to survive. *Id.*

As discussed above, Plaintiff here has not shown that she was subject to any adverse action on the part of the Defendant, and cannot establish that she suffered any damages as a result. Accordingly, her retaliation claim fails. Defendant is entitled to summary judgment on Count II of Plaintiff's Amended Complaint.

## VI. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. 45) is **GRANTED.**

A separate judgment will accompany this memorandum and order.

Dated this 2nd day of October, 2026.

/s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE